IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CYNTHIA R. WINDER          :      CIVIL ACTION
                           :
        v.                 :
                           :
PATRICK R. DONAHOE         :      NO. 11-878


MEMORANDUM


McLaughlin, J.                            August 17, 2012

        This case arises out of the plaintiff's employment as a
counselor with the United States Postal Service ("USPS") and her
failure to be hired for a supervisory position in her department.
Winder alleges that she was discriminated against on the basis of
her race and sex.  The defendant has moved for summary judgment
on the ground, among others, that the plaintiff's claim is time-
barred.  The Court will grant the motion on the ground that the
plaintiff's claim is time-barred.


I.   Summary Judgment Record

        Lisa Jordan, an African American female, became the
Manager of Human Resources for the Philadelphia District of the
Postal Service in July 2004.  Jordan Decl. ¶¶ 1, 15 (attached as
Ex. 1 to Def.'s Br.).  At the time, Steve Garnham was the EAP
Clinical Supervisor, an EAS-18 position that reported directly to
Ms. Jordan.  Id. ¶ 2.  The EAP department, which was a part of
the Human Resource department, provided counseling to USPS
employees and their families about a variety of issues.  Jordan

Decl. ¶ 2; Winder Aff. ¶ 7 (attached as Ex. 1 to Pl.'s Opp'n Br.).

The plaintiff is an African American female who has worked for the USPS since 1997.  Jordan Decl. ¶ 2; Winder Aff. ¶¶ 2-3.  She was hired as an EAP Assistant Counselor (EAS-15) in June 2002 while still pursuing her masters in social work. Jordan Decl. ¶ 2; Winder Aff. ¶¶ 4-5, 8.  In April 2004, plaintiff expressed her interest in training to become the Clinical Supervisor and submitted an Individual Development Plan (IDP) to Garnham, who approved the plan.  Winder Aff. ¶¶ 10-12; Pl.'s Ex. 2 (IDP).

In September 2004, an audit team from Federal Occupational Heath conducted a site visit to review the operations of the Philadelphia EAP office.  Jordan Decl. ¶ 3; Winder Aff. ¶ 13.  The team noted that the Philadelphia Joint Committee Employee Assistance Program ("JCEAP") was the only site within the USPS EAP that did not have at least the supervisor licensed, and recommended that the EAP Clinical Supervisor be state licensed in order to avoid potential liability issues. Jordan Decl. ¶ 3, Ex. A (site visit report); Winder Aff. ¶ 15. Due to this recommendation, in February 2005, Jordan met with Garnham and they agreed that he was to work towards obtaining a state license.  Jordan Decl. ¶ 4, Ex. B (memo to Garnham). However, he was to continue working as the EAP Clinical

2

Supervisor until January 2008, at which time he would be transferred to another position if he were not to obtain a state license by then.  Jordan Decl. ¶ 4; Winder Aff. ¶ 17.

At that time, the plaintiff was the only employee in the EAP department who held a state license.[1]  Jordan Decl. ¶ 4; Winder Aff. ¶ 16.  To comply with the site team's recommendation, Jordan asked the plaintiff, who was an EAP Assistant Counselor, to review case files while Garnham was working towards his license.  Jordan Decl. ¶ 4; Winder Aff. ¶ 17. While performing her higher-level duty of reviewing case files, which took approximately one day per week, the plaintiff was compensated at the higher EAS-18 level.[2]  Jordan Decl. ¶ 4; Winder Aff. ¶ 18; Pl.'s Ex. 16 (assignment orders showing pay rates).  During this time, the plaintiff was to continue reporting to Garnham administratively.  Jordan Decl. ¶ 4, Ex. B (memo to Steve Garnham).

In August 2005, Garnham resigned.  Jordan Decl. ¶ 5; Winder Aff. ¶ 19.  Jordan appointed Gerald Riley, a white male, as the temporary Acting EAP Clinical Supervisor.  Jordan Decl. ¶

---

[1] She obtained a Pennsylvania license as a social worker on January 19, 2005.  Winder Aff. ¶ 16.

[2] According to the plaintiff, she prepared written case reviews for each file, including ones maintained by Garnham. Winder Aff. ¶ 18.  She also provided feedback to each counselor, participated in team meetings, and started to learn the EAP office's administrative functions.  Id.

5; Winder Aff. ¶ 22.  Riley was an EAP counselor who had worked in the EAP department for more than a dozen years and in the USPS for more than twenty years.[3]  Jordan Decl. ¶ 5; Winder Aff. ¶¶ 7, 22.  Jordan knew he was not interested in a permanent position and under USPS rules, any employee who had been temporarily assigned to a position for more than 120 days became ineligible for placement in that position.  Jordan Decl. ¶ 5; Pl.'s Ex. 12 (USPS Employment and Placement Manual detailing the selection process); see also Jordan Decl. Ex. C (description for the EAP Clinical Supervisor position).  Jordan states that the plaintiff was ineligible for the Acting EAP Clinical Supervisor position at the time because she was not yet a Certified Employee Assistance Professional (CEAP), one of the requirements for that position.  Jordan Decl. ¶ 6, Ex. D (August 25, 2005, JCEAP meeting minutes).  However, Jordan recommended for the plaintiff to continue reviewing case files under Riley, since she was still the only one in her department who was state licensed.  Jordan Decl. ¶ 6, Ex. D; Winder Aff. ¶¶ 22-23.  These administrative changes were reported to the JCEAP Committee[4] (the "Committee") at the August

---

[3] Riley had previously worked as a USPS supervisor prior to working in the EAP department.  Jordan Decl. ¶ 5.

[4] The JCEAP Committee was a committee made up of representatives from the National Association of Letter Carriers, the American Postal Workers Union, and the USPS.  Winder Aff. ¶ 20.  According to the plaintiff, the "Philadelphia JCEAP was to provide advice and consent to important decisions affecting the quality of the services to employees, including the

2005 meeting.  Jordan Decl. Ex. D; Winder Aff. ¶¶ 21-23.  At the meeting, it was decided that Winder would be given a few months to acquire her CEAP and Jordan said that she would probably post the Clinical Supervisor position within four months.  Jordan Decl. Ex. D.

Although it was expected that the position would be posted by the end of 2005, the position was not posted until November 2007.  Jordan Decl. ¶ 9, Ex. F (internal posting), Ex. G (external posting); Winder Aff. ¶ 25.  During this intervening time, the plaintiff received her CEAP on October 1, 2005.  Winder Aff. ¶ 24.  Winder also claims that she was "effectively co-supervising" the EAP department and paid the higher EAS-18 level salary for one to two days per week.  Winder Aff. ¶ 25.  While Riley was the Acting Clinical Supervisor, plaintiff maintains that she familiarized herself with the "tasks of the Supervisor."  Winder Aff. ¶ 25.  The plaintiff's performance reviews from 2006 through 2008 show that she mostly received "Contributor" and "High Contributor" remarks from Riley.[5]  Pl.'s Ex. 3-4 (Winder's performance reviews).

---

qualifications and abilities of the counselors."  Id.  The Committee, which reported to the National Joint Committee Employee Assistance Program, discussed selection planning, job postings, applicants and decisions made by management.  Id.

[5] For most of the core requirements, an employee can be classified as a contributor, high contributor, or exceptional contributor.  Pl.'s Exs. 3-4.

According to the minutes prepared for the December 2005 Committee meeting, Riley updated the committee on EAP vacancies. Pl.'s Ex. 18 (December meeting minutes).  Riley announced that Winder had applied to the EAS-16 position, and that an EAP Assistant Counselor, Mike Koscinski, had expressed an interest in applying for the next EAS-16 position.  One of the attendees, Tim O'Malley, stated that his union did not receive a copy of the recently posted level 16 vacancy announcement, and asked if the unions could be informed about future EAP vacancy announcements. O'Malley also inquired into whether Winder could be considered for the level 18 Supervisor position and whether she would be required to act in the level 16 position for a certain period of time, should she be promoted to it, before being allowed to apply for the level 18 position.  The plaintiff was promoted from her Assistant Counselor (EAS-15) position to the Counselor (EAS-16) position in late 2005.  Winder Aff. ¶ 26.

After Garnham's departure, Jordan requested that USPS Headquarters revise the EAP Clinical Supervisor position description to require applicants to have a state license in some behavioral field, such as social work, psychology, professional counseling, or marriage or family therapy.  Jordan Decl. ¶¶ 7, 9. In July 2007, the requirements were finally updated.  Jordan Decl. ¶¶ 7, 9, Ex. E (memorandum dated July 18,2007).  Although the internal and external vacancy announcements for the EAP

Clinical Supervisor position were posted in September 2007, they had to be canceled because they did not include the state license requirement.  Jordan Decl. ¶ 8.

In November 2007, the USPS simultaneously issued the updated vacancy announcements, which incorporated the state licensure requirement, internally and externally.  Jordan Decl. ¶ 9, Ex. F (internal posting), Ex. G (external posting); Winder Aff. ¶ 29.  Jordan did not tell the Committee of these announcements.  Winder Aff. ¶ 30.  Pl.'s Ex. 17 at 29 (Zebin Dep.).  There were two internal applicants: the plaintiff and Koscinski.  Jordan Decl. ¶ 9, Ex. H (Winder's application).  The plaintiff claims that the application (Form 991) detailed her Knowledge, Skills and Abilities ("KSAs"), which demonstrated that she was qualified for the position.  Winder Aff. ¶ 31; Jordan Decl. Ex. H.

In February 2008, Jordan interviewed both the plaintiff and Koscinski.  Jordan Decl. ¶ 9; Winder Aff. ¶ 31.  The plaintiff asserts that her interview was "timed" for approximately 40 minutes, and she was asked questions from a prepared sheet of questions.  Winder Aff. ¶¶ 31-32.  She also states that Jordan told her that she did not need to answer some of the questions because she did not have supervisory experience. Winder Aff. ¶ 32.  In March 2008, Koscinski withdrew from

consideration because he had been promoted to another position. Jordan Decl. ¶ 9.

On April 1, 2008, Jordan met with the plaintiff to tell her that she was not planning on selecting the plaintiff for the position.  The plaintiff and defendant's version of the facts differ as to how Jordan explained her reasoning for not selecting the plaintiff.  Jordan Decl.; Winder Aff.  According to the defendant, Jordan did not select plaintiff because she believed the plaintiff needed to further develop her "supervisory and leadership skills."  Jordan told the plaintiff that she would like to develop an IDP with plaintiff to prepare her for a supervisory position in the future.  On the other hand, the plaintiff maintains that Jordan told her she did not have enough "supervisory experience," which she found odd because she claims she had been co-supervising the department, which had six employees, since August 2005.  The plaintiff also claims that during the meeting, Jordan tried to convince her that she did not want the position since there would be a lot of minutia to take care of.

Jordan told the plaintiff that she would need to send a narrative to the Philadelphia District Manager, Frank Neri, explaining her reasons for not selecting the plaintiff.  Jordan Decl. ¶ 10.  Jordan also told the plaintiff that if the plaintiff were to withdraw, then she could just use the withdrawal as her

reason and the narrative would not be unnecessary.  Jordan claims that she emphasized that the plaintiff did not have to withdraw just because she would need to send a narrative.  However, according to the plaintiff, Jordan advised her that in order to retain her "dignity," she could withdraw her application.  The plaintiff states that she was "intimidated" by this remark, and felt that Jordan would write false information about her to justify the non-selection.  Id. at 37.  She claims she was concerned about her reputation and also thought that, from Jordan's actions and statements during the interview, Jordan might have had a better candidate in mind for the position.

On April 2, 2008, the plaintiff gave Jordan a letter, in which she stated she was going to take Jordan's suggestion and withdraw her application.  She also stated that she liked the idea of developing an IDP geared towards further training.  The plaintiff claims that Jordan asked her for a different document to explain her withdrawal since Jordan did not want her to reference the suggestion.  The next morning, on April 3, Jordan sent the plaintiff an email to confirm that the plaintiff really wanted to withdraw, giving her until 4 PM that day to respond.[6]

---

[6] The plaintiff did not read the email until after 4 PM. Jordan Decl. ¶ 12.  Jordan noticed this and told her she could have until the next day to make her decision.  Jordan Decl. Ex. J.

Jordan Decl. Ex. K.[7]  At 5:52 PM, the plaintiff responded,
confirming her decision to withdraw.  Id. ("I am certain that I
would like to withdraw my application for the eAP Clinical
Supervisor vacancy.").  The plaintiff clarified that she was not
disappointed in Jordan's opinion of her and was grateful for
their discussion.  In her email, the plaintiff also stated that
the meeting helped her make up her mind,[8] as she had previously
considered withdrawing for personal reasons and had even started
to draft a withdrawal memo on March 28th.[9]  However, the
plaintiff states that she felt forced to write the "elaborate"
email and that she would not have submitted the letter of
withdrawal if Jordan had not suggested it.  Winder Aff. ¶¶ 39-40.
Jordan claims she spoke with the plaintiff one more time after

_____

[7] In her email, Jordan reiterated what she had said during
their April 1 conversation, which included informing the
plaintiff that she did not have to withdraw.  Jordan Decl. Ex. K.
She also stated that if the plaintiff chose not to withdraw, she
would change her letter to the District Manager explaining her
non-selection instead of indicating that the plaintiff withdrew.
Id.

[8] In her reply email, the plaintiff stated that Jordan gave
her a better understanding of what the position might entail and
that the position was not what the plaintiff had envisioned.  Id.
However, she also stated, "[u]nless there is something I have
overlooked, I appreciation [sic.] the guidance, knowledge, and
wisdom you have extended me concerning my professional growth
 . . . ." Id. (emphasis added).

[9] In her email, the plaintiff mentioned that she did not go
through with sending the March 28 withdrawal memo because she
wanted to give more thought about whether she could work through
"the situation."  Id.

the email exchange to confirm that she wanted to withdraw, and the plaintiff confirmed once again.  Jordan Decl. ¶ 12.  Jordan then notified Neri that both internal candidates had withdrawn.  Jordan Decl. ¶ 12, Ex. L (memo to Neri, dated April 3, 2008).

According to the USPS Employee and Placement Handbook, EAS positions are generally filled from within the USPS.  Pl.'s Ex. 12 § 743.21 (Employee and Placement Handbook).  However, management is not required "to select postal applicants over significantly better qualified external applicants."  Id.  Jordan claims that she did not open the envelope containing the external applications until the internal process was complete.  Jordan Decl. ¶ 13.  Therefore, she testified that she did not know who, or even how many external candidates, had applied.  Jordan Decl. ¶ 13; Pl.'s Ex. 5 at 191 (Jordan Dep.).  However, the plaintiff claims that at the April 1st meeting, Jordan held a stack of applications, approximately one-inch thick, and explained that she was still going through the applications.  Winder Aff. ¶ 35.

There turned out to be eight external applicants.  Jordan Decl. ¶ 13.  However, with the exception of Ronald Erenhouse, who was a state licensed professional counselor, none of the rest met the state licensure requirement.  Id.; Jordan Decl. ¶ 13; Ex. M (Erenhouse's application).  Erenhouse is a white male.  Winder Aff. ¶ 43.

In August 2008, Jordan interviewed Erenhouse, with the interview spanning almost two hours.  Jordan Decl. ¶ 13;  Pl.'s Opp'n Br. Ex. 5 at 193.  The Committee was not informed about his application until after Jordan interviewed him.  Pl.'s Ex. 7 (August 14, 2008 Committee meeting minutes) (noting that Jordan informed the committee she had interviewed someone for the EAP Clinical Supervisor position).  Jordan claims she was impressed with his experience,[10] knowledge, and interview since he had spent almost 20 years as the president of his own company before becoming a counselor.[11]  Jordan Decl. ¶ 13.  She also claims that his interview gave her "confidence that he would be able to run the EAP department."  Id.  She then arranged for the Committee to interview Erenhouse.  Id.  Although Riley and Koscinski were present for the interview, the plaintiff was not invited.  Winder Aff. ¶ 42.  The Committee members agreed[12] that Erenhouse would

_____

[10] Erenhouse's experience includes working as a licensed professional mental health counselor, a licensed co-occurring mental health clinician, a EAP specialist, a clinician, and case manager.  Jordan Decl. Ex. M.  All of the letters of recommendation attached to Erenhouse's application are positive. Id.

[11] Erenhouse's resume states that his company supplied precision timing equipment to major American clock makers and manufacturers.  Jordan Decl. Ex. M.

[12] Gwen Ivey, who was on the Committee that interviewed Erenhouse, testified to being impressed with Erenhouse and remembering that no one objected to hiring him.  Def.'s Ex. 4 (Ivey Dep.).  Similarly, Zebin, who was also on the Committee, testified that everyone agreed to offer Erenhouse the EAP Clinical Supervisor position.  Def.'s Ex. 5 (Zebin Dep.).

be hired as the new EAP Clinical Supervisor, and Jordan forwarded
her recommendation to select Erenhouse to Neri, who agreed.
Jordan Decl. ¶ 13, Ex. N (memo to Neri, dated October 10, 2008).
No one on the Committee knew that the plaintiff had applied and
been rejected.  Winder Aff. ¶ 41.

     The plaintiff alleges that Jordan purposely hid this
fact from the Committee, since vacancy postings and applications
were the kinds of things the Committee would have wanted to know
about.  Id. ¶ 47; Pl.'s Ex. 13 at 27-29, 45 (O'Malley Dep.).
Zebin, who was a part of the committee that interviewed
Erenhouse, testified that he did not know that the plaintiff had
applied for the position, but it was something that he would have
wanted to know about.  Pl.'s Ex. 17 at 44-45 (Zebin Dep.).

     On October 25, 2005, Erenhouse was hired as the EAP
Clinical Supervisor.  Winder Aff. ¶ 43.  It was then that the
plaintiff spoke to him about his experience, and learned that he
had never worked for the USPS and had no experience supervising
counselors.  Winder Aff. ¶ 44.  The plaintiff believed that her
qualifications were superior to his, because she considered
herself a co-supervisor of the EAP office, and more knowledgeable
about USPS operations, issues, rules, and policies.  Id.; Def.'s
Ex. 3 at 200 (Winder Dep.).  The plaintiff claims that upon

13

Erenhouse's hiring, her pay[13] and job responsibilities were negatively affected.  Winder Aff. ¶ 52.

The plaintiff claims that it was in October when she "developed the reasonable suspicion" that she had been discriminated against on the basis of her race and sex.  Id. ¶ 45.  The government disputes this fact, pointing to the plaintiff's testimony during her deposition.  For instance, the plaintiff testified that she felt like she was being discriminated against on the basis of race and sex when Riley was appointed Acting EAP Clinical Supervisor in 2005.  Def.'s Ex. 3 at 190 (Winder Dep.).  She also testified that around April 1st, it became apparent that she was discriminated against on the basis of her race and sex even though she "didn't want to see it."  Id. at 318.  Finally, she testified that in early April, she complained to a friend that she had been discriminated against.[14]  Id. at 332.

On November 5, 2008, the plaintiff contacted an EEO Manager, Mary Etta Johnson, to complain about the alleged

---

[13] Because Winder was compensated at the EAS-18 level for one to two days per week over the period of three years, her pay decreased to the EAS-16 level when Erenhouse took over reviewing of the case files.

[14] At some point after her meeting with Jordan, the plaintiff spoke to a friend, Pat Michelson, on the phone.  Pl.'s Ex. 6 (Michelson Aff.).  Michelson, a licensed social worker in Vermont, testified that the plaintiff felt threatened and was "afraid that her boss would retaliate against her if she did not withdraw."  Id.

discrimination.  Pl.'s Ex. 8 (information for pre-complaint counseling); Def.'s Ex. 2 (Johnson Decl.).  The formal complaint was filed on December 12, 2008.  Pl.'s Ex. 9.  The plaintiff alleged that Jordan wanted to select a white male over a black female for the EAP Supervisor position, despite the qualifications of the candidates.  Winder Aff. ¶ 50; Pl.'s Ex. 9).  The USPS dismissed Winder's EEO complaint in January 2009 for being untimely.  However, the EEOC reversed the dismissal on May 26, 2006, finding that Winder did not have reasonable suspicion that she had been discriminated against until Erenhouse was hired in October 2008.  Pl.'s Ex. 10 (EEOC decision, Winder v. Potter).

The plaintiff contends that Jordan discriminated against her because she was an African American female.  As support, she submits the affidavits of Amara Thorton Brown and Janice Smith.  Brown is an African American female who also alleged race and sex discrimination by Jordan.  Pl.'s Ex. 14 (Brown Aff.) (testifying that Jordan refused to assign her to the position of Acting Manager of Labor Relations and instead chose a white male from outside the department).  Smith, who was the Manager of Labor Relations and the one who tried to promote Brown, stated that Jordan had told her "not to hire any more African Americans" in her department because she wanted to diversify.  Pl.'s Ex. 15 (Smith Aff.).  Smith further claims that

15

Jordan spent one hour per week tutoring Erenhouse, training him for the Clinical Supervisor position because he was unfamiliar with the USPS rules, regulations, policies, and procedures.  Id.

Jordan denies discriminating against the plaintiff on the basis of race or sex.  Jordan Decl. ¶ 16.  She claims she has promoted or reassigned numerous African Americans and females to various positions in the department, including supervisory positions that reported to her.[15]  Id.

More recently, in 2010, Erenhouse resigned from his job.  Winder Aff. ¶ 53.  The plaintiff was then placed in the Acting Clinical Supervisor position.  At that time, she was the only one in her department with a state license.  She held the position until January 13, 2012, when Jordan removed her from the detail assignment and placed Koscinski, a white male, in the position.  At that point, Koscinski had just obtained his state license in December 2011.

---

[15] In her declaration, Jordan lists a number of black females whom she has promoted or assigned, including Cynthia Jackson, Janice Smith, Belinda Kelley, Debra Haynes, Terri Costner, and Kimberley Steele-Wiggins.  Jordan Decl. ¶ 16.

II.   <u>Analysis</u>

The defendant argues that the plaintiff's Title VII claim is barred for failure to exhaust administrative remedies.[16]   The government asserts that the plaintiff's failure to promote claim accrued on April 1, 2008, when she found out she would not be selected for the EAP Clinical Supervisor position.   According to the government's accrual date, the plaintiff's Title VII claim would be time barred because she did not contact an EEO counselor until November 5, 2008, past the 45-day time limitation.   <u>See</u> Def.'s Ex. 2 (Johnson Aff.).

Initiating contact with an EEO counselor is required for a plaintiff properly to exhaust administrative remedies. <u>Robinson v. Dalton</u>, 107 F.3d 1018, 1021 (3d Cir. 1997).   "In Title VII actions, failure to exhaust administrative remedies is an affirmative defense in the nature of statute of limitations." <u>Williams v. Runyon</u>, 130 F.3d 568, 573 (3d Cir. 1997).   The defendant bears the burden of proving that the plaintiff has failed to exhaust administrative remedies.   Under EEO regulations, federal employees must contact an EEO counselor "within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45

---

[16]   The defendant also argues that summary judgment should be granted on the merits of the plaintiff's claim.   The Court does not consider that argument because it finds that the plaintiff has failed to exhaust administrative remedies.

17

days of the effective date of the action."  29 C.F.R.
§ 1614.105(a)(1).

        In opposition, the plaintiff argues that her claim did
not accrue until October 25, 2008, the date on which Erenhouse
was hired.  The plaintiff maintains that her EEO contact was
timely on two separate grounds: 1) her actual date of injury was
October 25 because that was when she discovered the injury; and
2) the time limitation should be equitably tolled.


        A.   Date of Accrual and the Discovery Rule

        The defendant contends that the plaintiff's failure to
promote claim accrued on April 1, 2008, when Winder learned that
she would not be promoted to the EAS-18 position, not when she
subjectively concluded that she was illegally discriminated
against.  The plaintiff argues that the discovery rule postponed
the accrual date until October 25, when Erenhouse was hired.  The
plaintiff, therefore, contends that her EEO contact was timely
because she reached out to an EEO counselor within two weeks of
discovering her injury.

        According to the discovery rule, the statute of
limitations begins to run when the plaintiff's cause of action
accrues.  Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d
1380, 1385 (3d Cir. 1994).  The Third Circuit has clarified that
a claim accrues "upon awareness of actual injury, not upon

awareness that this injury constitutes a legal wrong." Id. at
1386.  The discovery rule "functions to delay the initial running
of the statutory limitations period, but only until the plaintiff
has discovered or, by exercising reasonable diligence, should
have discovered (1) that he or she has been injured, and (2) that
this injury has been caused by another party's conduct." Id.
Because reasonable diligence is an element of the discovery rule,
the date of accrual does not depend on the plaintiff's subjective
knowledge of injury.  Id.

     Here, the evidence shows that Winder knew that the
discriminatory act, her non-selection, occurred in April, when
she learned that Jordan was not going to promote her to the
Clinical Supervisor position.[17]  See Jordan Decl. ¶ 10; Winder
Aff. ¶ 33.  The plaintiff's main argument is that until
Erenhouse's selection, her employment injury was not "complete"
and she still "held onto the belief that there might be a
legitimate reason for not selecting her for the position."  Pl.'s
Opp'n Br. at 11-12.  She thought that she might receive another
chance at being promoted if Jordan re-posted the position after
not finding another qualified candidate.  Contrary to what the
plaintiff argues, the date of discovery does not change simply
because she waited around, hoping that she would get another

---

     [17] As the government points out, a claim accrues when a
plaintiff receives notice of an adverse employment action.  See
Def.'s Br. at 11 (citing a string of cases in support).

chance at being promoted.  She was already informed that she
would not become the new Clinical Supervisor.

> The plaintiff also asserts that because she was still
receiving pay at the EAS-18 level for one to two days per week,
she did not discover the "real harm" until her pay and job
responsibilities were curtailed upon Erenhouse's hiring.  Id. at
12 (referencing Winder Aff. ¶ 53).  The date of discovery,
however, does not change just because she suffered the
consequences of her non-selection at a later time.  The Supreme
Court has held that "the proper focus of the statute of
limitations inquiry is on the time of the discriminatory act, not
the point at which the consequences of the act become painful."
Chardon v. Fernandez, 454 U.S. 6, 8 (1981) (internal quotation
omitted).

> The plaintiff further argues that "the thought or idea
that Jordan was discriminating against her was not formed in her
mind in April of 2008" because she did not want to see it.  Pl.'s
Opp'n Br. at 13; Def.'s Ex. 3 at 318-19 (Winder Dep.).  She
insists that she did not know that her non-selection was
discriminatory in nature until she spoke with Erenhouse in
October and found out that he had no experience in supervising
counselors.  It was then that she concluded that Jordan was not
basing her selection on the plaintiff's supervisory experience,
but on her race and sex.  It makes no difference, however,

whether or not she knew that her non-selection was predicated on discrimination.  See Podobnik v. U.S. Postal Serv., 409 F.3d 584, 591 (3d Cir. 2005) ("Were we to extend the reach of the discovery rule to delay accrual until a plaintiff learned that a legal injury had occurred . . . a statute of limitations would become effectively meaningless . . . ."); Oshiver, 38 F.3d at 1391 (holding that the statutory period began to run upon the plaintiff's learning that she had been discharged from employment, not when she found out that her discharge was discriminatorily motivated).

Moreover, the fact that Jordan might have given her a fictitious reason for her non-selection is irrelevant for purposes of the discovery rule.  See Oshiver, 38 F.3d at 1391 ("That [plaintiff] may have been deceived regarding the underlying motive behind her discharge is irrelevant for purposes of the discovery rule.").  Consequently, it makes no difference that the plaintiff did not learn of Erenhouse's selection until October.  See Wastak v. Lehigh Valley Health Network, 342 F.3d 281, 287 (3d Cir. 2003) (deciding that, for the purpose of the plaintiff's age discrimination claims, the plaintiff's injury was complete and discovered when his employer terminated him, not when he learned that he was replaced by a younger worker).  The plaintiff did not have to know that her injury constituted a legal wrong for her claim to accrue.  Oshiver, 39 F.3d at 1386.

Finally, the plaintiff tries to characterize the entire hiring process, which stretched from April until October of 2008, as the adverse employment action.  This is the same as the argument that until Erenhouse was selected, she held on to the belief that she might get the job.  For purposes of the discovery rule, the date of accrual was April 1, 2008, not October 25, 2008.

B.   Equitable Tolling Doctrine

Alternatively, the plaintiff argues that even if her date of accrual is not October 25th, it should be equitably tolled until then because:  1) the Court should defer to the EEOC's decision that the plaintiff's EEO contact was timely; 2) Jordan actively misled the plaintiff; and 3) the continuing violation doctrine applies.  Because Title VII's time limitations are not jurisdictional, they are subject to equitable tolling.[18] Oshiver, 38 F.3d at 1387.  "Equitable tolling functions to stop the statute of limitations from running where the claim's accrual date has already passed."  Id.

---

[18] Equitable tolling is based on the notion that a party should not be allowed to profit from its own wrongdoing. Oshiver, 38 F.3d at 1388.

1.   <u>Administrative Deference to EEOC Decision</u>

The plaintiff first argues that the Court should defer to the EEOC's determination that the plaintiff's complaint was timely.  The EEOC reasoned that the time limitation for contacting an EEO counselor was not triggered until the plaintiff reasonably suspected discrimination.  <u>See</u> Pl.'s Ex. 10 (EEOC decision).  Accordingly, the EEOC concluded that Winder had no reasonable suspicion of discrimination until "all the facts that support a charge of discrimination have become apparent."  <u>Id.</u> Because Winder did not know that a white male was hired until October, the EEOC ruled that her contact of the EEO counselor on November 5, 2008, was timely.  <u>Id.</u>

In reply, the government argues that because the EEOC did not have the benefit of discovery, its decision is not entitled to deference.  The government cites <u>Chandler v. Roudebush</u>, which stated that district courts should conduct de novo review of administrative dispositions of federal employee discrimination complaints.  425 U.S. 840, 864 (1976).  The government argues that the EEOC's conclusion that the plaintiff had no reasonable suspicion "is simply not in accord with the record" because the plaintiff suspected that she had been the victim of discrimination prior to October 25th.  For instance, not only did Winder testify during her deposition that she thought Jordan discriminated against her in April, but she also

23

discussed this possibility with a friend around that time.  <u>See</u>
Def.'s Ex. 3 at 318-19, 332-33 (Winder Dep).  She also testified
that she felt like she was being discriminated against based on
her race and sex long in August 2005, when Jordan appointed Riley
to the Acting Clinical Supervisor position after Garnham's
resignation.  <u>Id.</u> at 190.

        The Court will not defer to the EEOC decision both
because the agency did not have the benefit of discovery and
because it is contrary to Third Circuit law.  The plaintiff's
deposition testimony reflects that she believed the facts
supporting her claim of discrimination were available to her in
April 2008; she even spoke with a friend about her suspicions.
The EEOC's decision, moreover, makes clear that the plaintiff
"was effectively non-selected in April 2008," which is the
relevant date for a Title VII limitations period under Third
Circuit law.  <u>E.g.</u>, <u>Oshiver</u>, 38 F.3d at 1391.


                2.  <u>Active Misleading</u>

        The plaintiff argues that the time limitation should be
equitably tolled because Jordan actively misled her during the
selection process.  The plaintiff contends that because Jordan
told her that she lacked supervisory experience, she believed she
was not selected for promotion based on a legitimate reason.  She
claims that she had no way of knowing that Jordan discriminated

                              24

against her until she had a chance to talk to Erenhouse about his supervisory experience.  The plaintiff argues, therefore, that the time limitation should be tolled until October 25, 2008, when she found out that an allegedly less qualified, white male filled the Clinical Supervisor position.

This argument is the same as the plaintiff's assertion that her cause of action accrued in October 2008 under the discovery rule, rejected above.  If a plaintiff alleging discrimination was entitled to equitable tolling on the argument that the proffered reason for an adverse employment action was false, nearly every Title VII plaintiff would be entitled to tolling, and the discovery rule would be rendered a nullity except in cases where an employer admits to discriminating at the time of the adverse employment action.

District courts are to apply equitable tolling sparingly, and only in one of three limited situations: 1) where the defendant has actively misled the plaintiff respecting the plaintiff's cause of action; 2) where the plaintiff is prevented from asserting his or her rights in some extraordinary way; or 3) where the plaintiff has timely asserted his or her rights mistakenly in the wrong forum.  Id.; see also Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 96 (1990).

With respect to the first situation, which is the only one contested in this case, the plaintiff must show that 1) "the

defendant actively misled the plaintiff," and 2) "this deception
caused the plaintiff's non-compliance with the limitations
provision." Ruehl v. Viacom, Inc., 500 F.3d 375, 384 (3d Cir.
2007) (quoting Oshiver, 38 F.3d at 1387).  For the employer to
have actively misled the plaintiff respecting her cause of action,
"the employer's own acts or omissions [must] have lulled the
plaintiff into forgoing prompt attempts to vindicate his rights,"
but need not be "egregious acts of active deception." Miller v.
Beneficial Mgmt. Corp., 977 F.2d 834, 845 (3d Cir. 1992).  To
invoke the doctrine, the plaintiff must show that "she could not,
by exercise of reasonable diligence, have discovered the essential
information bearing on her claim." Ruehl, 500 F.3d at 384.  Upon
such a showing, the statute of limitations will not begin to run
"until the facts which would support the plaintiff's cause of
action are apparent." Oshiver, 38 F.3d at 1389.  The plaintiff
has the burden of establishing that the equitable tolling doctrine
applies.[19]  Podobnik v. U.S. Postal Serv., 409 F.3d 584, 591 (3d
Cir. 2005).

---

[19] Both the Supreme Court and Third Circuit have cautioned
against the widespread use of the equitable tolling doctrine.
See Baldwin Cnty. Welcome Ctr. v. Brown, 466 U.S. 147, 152 (1984)
(cautioning that "[p]rocedural requirements established by
Congress for gaining access to the federal courts are not to be
disregarded by courts out of a vague sympathy for particular
litigants"); Seitzinger v. Reading Hosp. & Med. Ctr., 165 F.3d
236, 240 (3d. Cir. 1999) (choosing to "approach the doctrine
warily, so as to guard against possible misuse").  Therefore, the
burden on the plaintiff is substantial.

The plaintiff was not actively misled about her cause of action.  As discussed above, a plaintiff in a Title VII case need not know that her non-selection constitutes a legal wrong. Prodbnik, 409 F.3d at 591.  That she would not be selected was made clear by Jordan and confirmed in writing by Winder.  In addition, the plaintiff knew the extent of her supervisory experience.  Jordan could not mislead her about that.

Finally, the plaintiff did not exercise reasonable diligence in investigating her claim.  See New Castle Cnty. v. Halliburton NVS Corp., 111 F.3d 1116, 1126 (3d Cir. 1997). Accepting the plaintiff's version of the facts, and even if Jordan had actively misled Winder about the reason she was not hired, a reasonably diligent plaintiff would have discovered the "essential fact" Winder asserts was missing prior to October 2008.

The plaintiff wants to toll the initial running of the statutory period until October 25, 2008.  It is undisputed that Erenhouse was interviewed in August of 2008.  Jordan Decl. ¶ 13 (attached as Ex. 1 to Def.'s Br.); Pl.'s Ex. 5 at 193 (Jordan Dep.); Pl.'s Ex. 7 (August JCEAP Committee meeting minutes). Furthermore, the plaintiff knew that a candidate was being interviewed in August, since she notes that she was not invited to the Committee interview even though Koscinski and Riley were. Winder Aff. ¶ 13.  According to Winder's statement of the facts, she suggests that Jordan was looking at other applications in

27

April.  See Winder Aff. ¶ 35.  Therefore, at the very latest, the statute of limitations should only be tolled until August, in which case the plaintiff's EEO contact on November 5 would still be untimely.

Under these circumstances, a reasonably diligent plaintiff would have kept an eye on the hiring process and would have inquired into how the external selection process was coming along.  This is especially true since the summary judgment record establishes that the plaintiff was suspicious of Jordan and suspected that she had been discriminated against.  See Def.'s Ex. 3 at 190 (Winder Dep.) (testifying that she felt like she was being discriminated against on the basis of her race and sex as early as 2005, when Riley was appointed Acting EAP Clinical Supervisor); Id. at 318 (testifying that around April 1, it became apparent to her that she was being discriminated against even though she "didn't want to see it."); Id. at 332-33.

Additionally, the defendant is entitled to summary judgment under Hart v. J.T. Baker Chemical Co., 598 F.2d 829, 931 (3d Cir. 1979), and Meyer v. Riegel Products Corp., 720 F.2d 303, 308 (3d Cir. 1983).  In Hart, the plaintiff brought a Title VII claim asserting that her discharge was discriminatory.  However, she brought her claim 421 days after her discharge, arguing that the time limitation should be equitably tolled until the date when she could have reasonably discovered that her dismissal might have

been gender-motivated.   Hart, 598 F.2d at 834.  She asserted that the employer gave her four reasons for her discharge, all unrelated to her gender.  Id. at 833.  The Third Circuit affirmed the district court's refusal to apply the equitable tolling doctrine, reasoning that "all of the facts upon which [plaintiff's] charge of discrimination was predicated were known to her on the date of her discharge."  Id.  The Hart court found that the plaintiff's "suspicions were sufficient to lead a reasonable person to inquire further into the reasons for her discharge."  Id. at 834.

        In Meyer, the Court of Appeals distinguished Hart because the plaintiff had alleged what the Hart plaintiff had not: the "defendant deceived him into postponing the filing of a claim."  Meyer, 720 F.2d at 308.  The court stated that the Meyer plaintiff did precisely what the Hart court suggested: he exercised reasonable diligence by asking the defendants for an explanation of his dismissal.  Id.

        In this case, the plaintiff cannot show that due to the defendant's deception, she could not have discovered, by reasonable diligence, the essential factual information bearing on her claim.  See Oshiver, 38 F.3d at 1390.  More specifically, the plaintiff did not act like a "person with a reasonably prudent regard for his or her rights."  Oshiver, 38 F.3d at 1389.

A reasonably prudent person in Winder's position, who suspected discriminatory motives on the part of Jordan, would have inquired into the defendant's hiring practices prior to October. Equitable tolling is thus inappropriate under the circumstances.

    C.   <u>Continuing Violation Doctrine</u>

Finally, the plaintiff argues for the applicability of the continuing violation doctrine.  She takes the position that the defendant's unlawful employment hiring practices constituted "an ongoing process of discrimination" that continued for months until October 25th, when "the position was finally filled and Winder was stripped of her additional job duties and the pay increase."  Pl.'s Opp'n Br. at 15.  In reply, the government argues that the failure to promote was a discrete employment action and, therefore, the continuing violation doctrine does not apply.

The continuing violation doctrine is an equitable exception to the timely filing requirement.  <u>West v. Philadelphia Elec. Co.</u>, 45 F.3d 744, 754 (3d Cir. 1995).  It allows for the statute of limitations to begin running on the date of the last occurrence of discrimination, rather than the first, if the alleged discriminatory conduct was a "continuing violation." <u>Miller</u>, 977 F.2d at 842 (citing <u>Bronze Shields, Inc. v. New Jersey Dept. of Civ. Serv.</u>, 667 F.2d 1074, 1081 (3d Cir. 1981),

30

cert. denied, 458 U.S. 1122 (1982)).  "[T]he plaintiff must show
more than the occurrence of isolated or sporadic acts of
intentional discrimination, and "that some form of intentional
discrimination against the class of which plaintiff was a member
was the company's 'standard operating procedure.'" Id. at 844;
West, 45 F.3d at 755 ("The relevant distinction is between the
occurrence of isolated, intermittent acts of discrimination and a
persistent, on-going pattern.")

         According to Third Circuit jurisprudence, whether a
failure to promote constitutes a continuing violation depends on
the nature of the claim.  In Miller, the Third Circuit held that
the plaintiff sufficiently alleged a continuing violation where
the claim involved a repeated failure to promote.  977 F.2d at
844.  In other words, if an employee was qualified for promotion
and could have been promoted at any time, then the continuing
violation doctrine applies.  See id.  On the other hand, the
doctrine does not apply where the "plaintiff sought to be
promoted to fill a series of specific vacancies."  See Jewett v.
Int'l Tel. & Tel. Corp., 653 F.2d 89 (3d Cir. 1981) (reasoning
that in this situation, the plaintiff could not prove a pattern
or practice of intentional discrimination to support a finding
that there was a continuing violation of Title VII).  Therefore,
whether the continuing violation doctrine applies turns on

whether the plaintiff is seeking to fill a specific vacancy or seeking a promotion that could have been granted at any time.

Here, the plaintiff was considered for a specific position – the EAP Clinical Supervisor - and was not selected. This is a discrete act.  Winder's argument to invoke the continuing violation doctrine under the facts alleged is inappropriate under the law of this Circuit.

Because Winder's EEO contact was untimely and she is not able to establish equitable tolling, the defendant's motion will be granted.

An appropriate order will issue separately.